## THE STATE v. W. C. FERRELL, Appellant.

**Division Two, December 10, 1912.**

1. **EVIDENCE: Statements by Coconspirator: Objection.** Statements made by one coconspirator to another, which were not made in furtherance of the original conspiracy, if the real ground of their incompetency is called to the court's attention by a proper objection, should be excluded.

2. **———: Conspiracy: Date of Consummation: Abandonment.** It is not incumbent upon the State to prove that the conspirators, who had agreed to lie in wait and shoot another on a certain night, had also agreed that such other should be killed on the date he was killed some six months later. When there is proof that the conspiracy had been formed, it will be presumed that it had not been abandoned when there is no evidence or circumstance to indicate abandonment.

3. **———: ———: Continued Hostility.** Statements made by one conspirator to others, after the conspiracy was formed and before the killing, indicating continued hostility towards the person shot at, are competent.

4. **INSTRUCTION: Omitting Malice Before Aforethought.** An instruction telling the jury that if defendant "wilfully, premeditatedly and with aforethought shot and mortally wounded with a gun loaded with gunpowder and leaden ball one William M. Moore in an attempt at said time and place to wilfully, premeditatedly and with malice aforethought, to kill one William M. Grider," etc., is not reversible error. The omission of the word "malice" before the word "aforethought," in view of the fact that "malice aforethought" occurs further on, was neither misleading nor prejudicial, under the circumstances of the case.

5. **ARGUMENT OF COUNSEL: Comment on Falsity of Defendant's Testimony.** Where defendant, who is charged with having, from his home, a distance of 1670 feet, fired at Grider who was on a horse and killed Moore standing by the horse, had testified that he was at home but did not hear the shot fired, and five other witnesses had testified that the shot was fired from a point at or near defendant's house, it was entirely proper for the prosecuting attorney, in his argument to the jury, to comment on the fact that defendant had testified that he did not hear the shot. Such remarks were not a comment on defendant's silence, but a proper argument upon the falsity of his testimony.

State v. Ferrell.

6. ————: **Reference to Defendant's Failure to Explain.** Where defendant voluntarily testifies concerning certain facts, but fails to testify concerning others, a reference by the prosecuting attorney in his argument to the jury to the facts concerning which defendant remained silent, if unintentionally made and a prompt rebuke is administered by the court, does not constitute reversible error.

7. ————: **Reference to Coconspirator Not on Trial: Payment of Attorney's Fee.** The prosecuting attorney, in his argument to the jury, stated that a certain coconspirator, who had been tried and acquitted, was present and helping defendant in his defense; that he was the man behind the whole thing; that he was the man who was paying defendant's attorneys; and that he was the brains of the whole conspiracy. Thereupon the coconspirator said: "Don't say that any more." Defendant's attorney objected to the prosecuting attorney stating something not in evidence, and the court stated: "I think you are out of the record." Thereupon the prosecuting attorney said: "I notice my remarks cause a great deal of commotion." Thereupon the court said: "Leave off the comments and just stay within the record." The evidence makes out a prima facie case of conspiracy to kill, and points to this man as one of its leading members, and the only fact stated by the prosecuting attorney that is not fully sustained by the evidence is that the coconspirator was paying defendant's attorneys. *Held*, that the remarks do not constitute reversible error. Besides, as defendant's attorney failed to call the court's attention to the particular part of the argument which was outside the record, the court would have committed no error if it had wholly disregarded the objection.

8. **INSTRUCTION: Reasonable Doubt: Repetition.** One correct instruction on the law of reasonable doubt is sufficient. Repetition in the instructions of that phase of the law is liable to lead the jury to believe that the court is in doubt as to defendant's guilt.

Appeal from Callaway Circuit Court.—*Hon. A. W. Walker*, Special Judge.

AFFIRMED.

*Charles M. Hay* and *H. N. Eversole* for appellant.

(1) The conversation between witnesses Dunn and Leggett and the conversation between Westbrook

and Leggett were inadmissible and highly prejudicial to defendant. (a) As to the first, it is admitted by Dunn himself that said conversation did not take place in the presence of the defendant, and that it was had after December 16, 1908. Defendant's objection was based on the proposition that the State had made no prima facie showing that a conspiracy existed between defendant and any others at any time subsequent to December 16, 1908, and prior to June 17, 1909, between which dates said witness Dunn testifies that this conversation took place. The theory on which this evidence was received in the circuit court was that said evidence was competent and admissible even if made after the conspiracy which Dunn said existed on December 16, 1908, had been abandoned or the object of the conspiracy had been accomplished. This position is borne out by the failure of the court to require the State to prove or make out prima facie, preliminary to the introduction of the evidence objected to by the defendant, that the conspiracy was still in existence at the time Dunn alleges this conversation took place between himself and Leggett. 6 Am. & Eng. Ency. Law, 571, 869; State v. Fredericks, 85 Mo. 150; State v. Reed, 85 Mo. 198; State v. Flanders, 118 Mo. 227. (b) As to the conversation between Westbrook and Leggett, the record clearly shows that the defendant was not present at the time it is alleged to have taken place. If the trial court admitted the evidence on the theory that Leggett was a coconspirator with defendant, then the court committed error in peremptorily overruling defendant's objection without requiring the State to make out a prima facie case showing that a conspiracy existed between Leggett and the defendant at the date this conversation is alleged by Westbrook to have taken place. 6 Am. & Eng. Ency. Law, 571, 869; State v. Fredericks, 85 Mo. 150. (2) In the opening argument for the State the assistant prosecuting attorney committed reversible error

in commenting upon defendant's failure to explain or to testify as to why he did not hear the shot fired that killed Moore. State v. Ferrell, 233 Mo. 452; State v. Dietz, 235 Mo. 332; State v. Spivey, 191 Mo. 112. (3) The repeated reference of the assistant prosecuting attorney to appellant's failure to explain the where- ' abouts of the gun and the failure of the court, on defendant's insistence, to properly reprimand and rebuke the assistant prosecuting attorney therefor was reversible error. State v. Dietz, 235 Mo. 341; State v. Ferrell, 233 Mo. 458. (4) An instruction for murder which omits a finding of "malice" is an incorrect statement of the substantive law and hence the giving of such an instruction demands the reversal of this cause. State v. Pacquett, 75 Mo. 330; State v. Simms, 68 Mo. 305; State v. Mitchell, 64 Mo. 192; State v. Rose, 142 Mo. 426.

*Elliott W. Major,* Attorney-General, and *John M. Dawson,* Assistant Attorney-General, for the State.

(1) If several persons conspire to do an unlawful act, and death occurs in the prosecuting of the common object, all are alike guilty of the homicide. 2 Hawk., P. C., Ch. 29; 1 Hale, P. C., Ch. 34; 1 Russell on Crimes, 24; 1 Chitty's Crim. Law, 264; 1 McLain on Crim. Law, Sec. 196. (2) Evidence of conspirators is admissible when said declarations are made after the conspiracy is formed and before the offense is committed. State v. Kennedy, 177 Mo. 98; Lamb v. People, 96 Ill. 73; 1 Bishop Crim. Law (7 Ed.), 637; State v. Gatlin, 170 Mo. 354; State v. Copeman, 186 Mo. 109; State v. Shelledy, 8 Iowa 477. (3) The argument complained of is not reversible error. The court rebuked Mr. Tincher where he said appellant would have heard the shot that was fired. The court sufficiently rebuked the State's attorney. State v. Mahly, 48 Mo. 319; State v. Sublett, 191 Mo. 174. (4) The

appellant took the stand in his own behalf and, hav-
ing done so, his evidence or want of evidence may be
discussed the same as that of other witnesses. Secs.
5242 and 5243, R. S. 1909. There is a difference be-
tween the appellant not testifying and testifying only
to certain things. State v. Schmidt, 136 Mo. 644. Re-
marks of counsel cannot be construed as a reference
to appellant's failure to testify where appellant has
testified in his own behalf. State v. Grubb, 201 Mo.
585. This language of the State's attorney, together
with the rebuke of the court, was sufficient to convince
the jury that he did not intend to get out of the evi-
dence, and that such remarks were sufficiently with-
drawn from the consideration of the jury, and same
did not prejudice the jury. State v. Summar, 143 Mo.
234; State v. Hyland, 144 Mo. 313; State v. Evans, 124
Mo. 397; State v. Kaiser, 130 Mo. 436; State v. Emory,
79 Mo. 463; State v. Allen, 174 Mo. 698; State v. Pun-
shon, 133 Mo. 58.

BROWN, P. J.—Defendant appeals from a judg-
ment of the circuit court of Callaway county, sentenc-
ing him to serve a term of ten years in the peniten-
tiary for the alleged murder of one William Moore.
This is the second conviction and second appeal in this
case. [233 Mo. 452.]

An indictment charging defendant and four other
persons, to-wit, J. L. Dunn, J. F. Liggett, Mollie Lig-
gett and Charles Ferrell, with murder in the first de-
gree, by shooting and killing William Moore, was re-
turned by the grand jury of Callaway county. The
State elected to prosecute only for the crime of mur-
der in the second degree. J. F. Liggett was tried and
acquitted, and defendant was separately tried and con-
victed.

The defendant and his coindictees are farmers,
and at the time of the homicide lived within a few hun-
dred yards of each other and maintained intimate so-

cial relations.  Within a short distance of these parties also resided one William M. Grider, who was heartily hated by defendant and his coindictees.

The evidence on the part of the State tends to prove that on June 17, 1909, said William M. Grider started on horseback to Jefferson City and after he had passed 1670 feet beyond defendant's house, met the deceased (Moore) walking along the public road. Grider stopped his horse to talk with deceased, turning his horse somewhat crosswise of the road.  While in this position, a shot was fired from the direction of defendant's house and the bullet which produced the tragedy first struck Grider's horse and then passed into the body of Moore, producing his death within an hour.  The evidence does not indicate that any enmity existed between defendant Ferrell and deceased; and the theory of the State is that as deceased was standing behind Grider's horse and the view somewhat obstructed, defendant did not see deceased, but fired the fatal shot intending to kill Grider.

From observations made by a surveyor and other parties, by placing a man on horseback in the place where Grider's horse stood at the time of the tragedy, and another man by the side of the horse, together with the wound on the horse's hip, the indications were that the shot which killed Moore was fired either from defendant's house or from some point in the direction of his house.

There was further testimony that a person at or in defendant's house could see Grider as he sat on his horse at the place where Moore was killed.

John Dunn, one of the parties indicted with defendant, testified on the part of the State to a conspiracy formed on December 17, 1908, whereby he and his coindictees agreed to lie in wait and shoot Grider on that night as he returned from a near-by town. Dunn did not perform his part of the conspiracy and

Grider was not killed or assaulted at the time agreed upon.

Dunn further testified that when he met defendant a few days later, he (Dunn) pleaded the sickness of his wife as an excuse for failing to perform his part of the criminal compact. It was thereupon agreed that they would have to "set some other time to get him" (Grider). There is no evidence that any other date was ever agreed upon for the killing of Grider, but there is evidence of continued malice on the part of defendant and his coindictees against Grider, accompanied by frequent threats up to the day of the homicide.

We find nothing in the record to indicate that defendant abandoned the conspiracy, if he ever entered into such a conspiracy to kill Grider, as testified to by Dunn.

It is clearly proven that intimate social relations between defendant and his coindictees continued up to the day that Moore was killed, and that the defendant and at least three of his coindictees were together near the place from which the fatal shot was fired less than an hour before the tragedy.

The State's evidence further tended to prove that the defendant came to Jefferson City on May 22, 1909, and purchased a Springfield army rifle, caliber .45-70, and a box containing six cartridges, from one Lohman, a merchant. Defendant did not pay for the gun then, but promised to do so if it suited him. He stated that he wanted to take the gun to Arkansas with him if he found it satisfactory.

The night after Moore was killed, defendant's house was searched. In the loft thereof, a cartridge box with some blank cartridges were discovered. The army rifle was not found. Lohman, the merchant who sold defendant the cartridges, identified the cartridge box by a private mark placed on same while it was in his store.

There was evidence on the part of the State that the bullet which killed Moore and which was found lodged in his clothing was of the same make and size as those used in a .45-70 caliber Springfield army rifle, and also evidence on the part of defendant that the bullet so found was smaller than those usually fired from a rifle of that make and caliber.

When arrested, defendant first told the sheriff that he never owned or had in his possession a larger rifle than a .32 caliber; but when his attention was called to his purchase from Lohman of the army rifle, he stated to the sheriff that he purchased that gun for a man named Kesser who was going to Arkansas; that while in Jefferson City he sold it to Kesser on credit and that Kesser sent the purchase money by post office or express money order from Springfield, Missouri, to Mrs. Francis Waters, a stepdaughter of defendant, who turned it over to him. Mrs. Waters was sworn and testified that she never received any such money order and did not know that defendant had the gun. Kesser was not called as a witness.

W. H. Parks, a second-hand dealer of Jefferson City, testified that about two months before May 22, 1909, he sold defendant a .32 caliber Winchester rifle, and that on said May 22, 1909, defendant came to his store and asked to trade the .32 Winchester for a larger gun, stating that hawks were bothering him and he wanted a larger gun to kill them with.

J. F. Liggett (jointly indicted with defendant) testified that he came to Jefferson City with defendant in a wagon on May 22, 1909 (the day the army rifle was purchased), and that defendant did not take the army rifle home with him. Liggett further testified that he knew nothing of the alleged conspiracy to kill Grider, but had heard witness Dunn make many threats against the life of Grider. He also testified that he did not hear the shot fired which killed Moore, though the evidence all tends to show that he was

within less than 300 yards of the place where Moore was killed.

Four witnesses who were working on farms from a quarter to a half-mile from the scene of the homicide, testified that they distinctly heard a gun discharged about the time that Moore was killed, and that the report or sound of said gun came from the direction of defendant's house.

Defendant was sworn and testified that he did not fire the shot which killed Moore; that he was at home at the time of the killing, but did not hear any shot fired. He failed to testify in regard to other facts in the case.

Other facts necessary to a full understanding of the case, will be noted in connection with our opinion.

I. Defendant assigns error in the trial court's action in admitting criminating statements made to witnesses Dunn and Westbrook by J. F. Liggett (a coconspirator) after the conspiracy was formed and before the killing of Moore. These statements by Liggett indicated continued hostility against Grider and determination to get rid of him in some way.

When this evidence was offered, defendant's attorney interposed the following objection:

"I object to any testimony on the part of this witness as to what transpired between this witness and any other defendant in this case, other than W. C. Ferrell, at any time between December 16, 1908, and the date of the alleged death of Moore, unless it be further shown that the alleged conspiracy existed on the morning of June 17, 1909, as any statements made by any of these persons are in no sense binding upon the defendant and only calculated to confuse the issues in the case."

It does not appear that all these statements were made by Liggett in aid or furtherance of the original conspiracy to kill Grider; and if they had been ob-

jected to on that ground, some of them at least should have been excluded. [8 Cyc. 680; Wharton's Criminal. Law (10 Ed.), Secs. 1405-6; State v. Bobbitt, 228 Mo. 252.]

It will be observed, however, that the trial court's attention was not called to the real grounds which rendered this class of evidence inadmissible; therefore, the court did not commit reversible error by admitting it. Trial courts are not supposed both to know and remember all the law all the time; hence, the necessity of requiring attorneys to point out the specific grounds upon which improper evidence should be excluded. [Russell v. Glasser, 93 Mo. l. c. 360; Adair v. Mette, 156 Mo. l. c. 507, and cases there cited.]

The evidence complained of was valuable to the State as tending to prove the intense hostility of Liggett, one of the conspirators, against Grider; and it further tended to prove that the conspiracy had not been abandoned. It was not incumbent upon the State to prove that the conspirators had agreed upon June 17, 1909, as the exact date when Grider should be killed.

It is undoubtedly true that individuals are more likely to commit crimes when they are assured in advance that their criminal conduct will be approved by their neighbors; and when it is shown that an agreement or compact has been formed between several persons to aid or co-operate with each other in the perpetration of a crime, it will not be presumed that such conspiracy has been abandoned when (as in this case) there is no evidence or circumstance to indicate such abandonment. The admission of statements made by Liggett was not error.

II. Defendant also complains of instruction numbered 6, given on the part of the State, as follows:

"The court instructs the jury that if you believe from the evidence beyond a reasonable doubt that the

defendant at the county of Callaway and in the State of Missouri did on or about the seventeenth day of June, 1909, or at any time before the finding of the indictment herein, *willfully, premeditatedly, and with aforethought,* shoot and mortally wound with a gun loaded with gunpowder and leaden ball one William (Monk) Moore in an attempt at said time and place to willfully, premeditatedly, and with malice aforethought, to kill one William M. Grider, and you further find from the evidence that within a year and a day after such shooting and wounding the said William (Monk) Moore died from the effects of such shooting and wounding done by the defendant as aforesaid, you will find the defendant guilty of murder in the second degree and assess his punishment at imprisonment for a term of not less than ten years.''

The defendant insists that the word ''malice'' should have been inserted just before the word ''aforethought,'' where said last named word occurs the first time in the quoted instruction; and that by the omission of said word ''malice'' at that particular place, the instruction is not only incorrect and confusing, but constitutes reversible error.

Defendant's contention is unsound. In view of the fact that the words ''malice aforethought'' did occur in the latter part of the instruction complained of, we hold that the omission of the said word ''malice'' in the first part of said instruction was neither misleading nor prejudicial. The words ''willfully, premeditatedly and with aforethought,'' as italicized in the quoted instruction, could have all been omitted, and the instruction would still be correct, as applied to the evidence in this case.

III. It is further insisted by the defendant that the trial court erred in failing to instruct on the law of manslaughter in the fourth degree. His contention is that the State's evidence tended to prove that the

defendant did not shoot at Grider with the intention of killing either him or Moore, but only with a design to scare Grider.

After a careful inspection of the record, we are convinced that there is no evidence upon which to base a manslaughter instruction. In fact, there is no evidence which warrants an instruction on any crime except murder in the first degree. The prosecuting attorney's election to prosecute for murder in the second degree is the only thing which justified the court in giving an instruction for murder in the second degree.

IV. Further error is assigned in the action of the assistant prosecuting attorney in commenting on the fact that defendant did not hear the shot which killed William Moore. There was no error in this part of Mr. Tincher's argument. Defendant had, without objection, testified that he was at home but did not hear the shot fired; and as five other witnesses had testified that the shot was fired from a point at or near defendant's house, it was entirely proper for the assistant prosecutor to call the attention of the jury to the improbability of his evidence. These remarks were not a comment on defendant's silence, but a proper argument upon the falsity of his evidence, as given.

V. In the further argument of the case by the assistant prosecutor, the following occurred:

"By Mr. Tincher: Then we find him, gentlemen, in the possession of this gun. He has not explained to this jury in any sort of a satisfactory manner how he got rid of that gun, and I dare Mr. Hay, the eloquent attorney for the defendant—

"By Mr. Hay: I object to the remark of the prosecuting attorney as being a comment upon the failure of the defendant to explain it and ask that he be reprimanded for such a remark.

"By the Court: No remarks should be made to the defendant's not testifying in any respect. Do not refer to the defendant's failure to testify to anything, Mr. Tincher.

"By Mr. Hay: I ask that he be more severely reprimanded, and except to the failure of the court so to do.

"By the Court: Your objection should be more timely, Mr. Hay. (To Mr. Tincher) Proceed with the the argument. Do not refer in any way to the defendant, Mr. Tincher, failing to testify to anything.

"And to the above remarks of counsel for the State and to the action of the court in failing to properly rebuke him therefor, the defendant, by his counsel, then and there at the time duly excepted and saved his exceptions.

"Thereupon, Mr. Tincher proceeded with his remarks, referring to the transfer of the intent to kill, from Grider to Moore, then saying: 'The fact that he had nothing against old man Moore don't cut any figure in the case whatever. Now, let us go a little further. We find him in possession of that gun and he has not explained how he got rid of the gun.'

"By Mr. Hay: I object to that as a comment upon the failure of defendant to testify.

"By the Court: You must refrain from commenting upon the defendant's not testifying.

"By Mr. Tincher: I didn't aim to do that. I certainly did not intend to do so.

"By the Court: Well, you must refrain from it. You have been corrected long enough."

The assistant prosecutor's reference to defendant's failure to explain to the jury what he did with the army rifle was of course an improper comment upon defendant's silence regarding a matter upon which he had a lawful right to remain silent; but after careful consideration, we do not think the language

objected to amounted to such a gross invasion of defendant's rights as to justify a reversal.

The last remark of Mr. Tincher seems to have been an inadvertence, and the court promptly rebuked him as severely as it was possible without administering a fine. It is not at all probable that it harmed the defendant.

When a defendant is not sworn, a comment upon his silence is much more inexcusable than when he has been sworn and testifies to a part of the facts in a case and remains silent as to the others.

When the defendant, as in this case, voluntarily testifies regarding part of the facts in evidence and fails to give evidence in regard to other connected facts, it is very difficult for the prosecutor to make an effective argument without either directly or indirectly making improper reference to some point upon which the defendant has remained silent; and in such cases, when the improper remarks of the prosecutor do not appear to have been intentionally made and a prompt rebuke is administered by the court, we are inclined to treat the error as harmless.

In the concluding argument by Mr. Baker, the prosecuting attorney, the following occurred:

"By Mr. Baker: Liggett is the man whom you have seen sitting over there helping Ferrell in his defense. Liggett is the man who is back of this whole thing. Liggett is the man who is paying Ferrell's attorneys in this case. Liggett was the man who was the brains of the whole conspiracy.

"By J. F. Liggett (a bystander): 'Don't say that any more.'

"By Mr. Hay: We object to the gentleman stating something not in evidence.

"By the Court: Yes, sir, I think you are out of the record.

"By Mr. Baker: I notice my remarks cause a great deal of commotion.

"By the Court: Leave off the comments and just stay within the record."

The only part of Mr. Baker's argument which was not fully sustained by the evidence was the statement that Liggett was paying defendant's attorney fees. The record shows that if the conspiracy was formed to kill Grider, it was entered into in Liggett's home; that between the day of forming the conspiracy and the killing of Moore, Liggett continued to tell his coconspirators that they should get rid of Grider in some way. On one occasion some affidavits were prepared and signed by the wife of witness Dunn charging Grider with a crime, the prosecution of which was barred by the Statute of Limitations. Liggett took those affidavits to the prosecuting attorney and when the latter declined to prosecute Grider, Liggett stated that it would afford him pleasure to tie one end of a rope around Grider's neck and the other end around the neck of the prosecuting attorney, and swing them across a limb. Some days later, and before the homicide, Liggett suggested to Dunn that the affidavits be changed so as to charge the crime to have been committed by Grider at a later date than it was really committed, in order that the prosecution might be maintained.

In view of the foregoing evidence, the prosecuting attorney was not outside the record when he referred to Liggett as being the "brains of the whole conspiracy." His remark was a legitimate inference from the evidence in the record. We do not know what evidence was before the jury which acquitted Liggett, but the evidence in this record makes out a prima facie case of conspiracy to kill Grider, and points to Liggett as one of the leading members of such conspiracy.

The remarks of Mr. Baker complained of do not constitute reversible error. In fact, the defendant's attorney having failed to call the court's attention to

the particular part of the argument which was outside the record (the payment of attorney's fees), the court would have committed no error if it had wholly disregarded the objection.

We reversed the first judgment of conviction in this case on account of the improper argument of the prosecuting attorney. On that appeal, it appears that the trial court directly sanctioned and approved a part of the improper argument, and when the most damaging remarks were made (the reference to the failure of defendant and some of his coindictees to deny the conspiracy), the court, upon objection, not only neglected to rebuke the prosecutor, but attempted to delegate to the jury the power to determine whether or not the argument was or was not an improper comment upon the silence of defendant. The record now before us is very different from the one presented in the first appeal. In the latter trial, the court diligently endeavored to protect the rights of the defendant, even going so far as to rebuke the State's counsel twice when their remarks were not improper.

Notwithstanding the assistant prosecutor made a few improper remarks, we find the defendant had a fair trial.

The court was excessively liberal to defendant in its instructions—eight of the twenty instructions given dealt with the law of reasonable doubt. One correct instruction on the law of reasonable doubt is sufficient. [State v. Marsh, 171 Mo. 523.] The repetition of that phase of the law in instructions is liable to lead the jury to believe that the court itself is in doubt as to the defendant's guilt, when it is his duty, if he submits a case to the jury at all, to refrain from informing the jury what his personal views are as to the guilt or innocence of the defendant.

However, the act of the court in unduly emphasizing the law of reasonable doubt, was an error in

favor of the defendant, and as he was convicted, the State cannot complain.

The judgment is affirmed. *Ferriss* and *Kennish, JJ.,* concur.