STATE v. EDWARD HILL, Appellant.—No. 38859.—179 S. W. (2d) 712.

Division Two, April 3, 1944.

Rehearing Denied, May 2, 1944.

*Dewey S. Godfrey, Rudolph K. Schurr* and *John L. Sullivan* for appellant.

896

*Roy McKittrick*, Attorney General, and *Gaylord Wilkins*, Assistant Attorney General, for respondent.

WESTHUES, C.—Edward Hill was convicted in the circuit court of the city of St. Louis, Missouri, on a charge of embezzlement and sentenced to imprisonment in the penitentiary for a term of three years. He appealed.

Appellant has questioned the sufficiency of the indictment and has pointed out three alleged defects; first, that the indictment is indefinite, uncertain and misleading; second, that there is a misjoinder of causes of action in that it charges the defendant with a conspiracy, being a misdemeanor, and also embezzlement, a felony; third, that the indictment contains several offenses united in one in that it charges in one count a misdemeanor and also a felony. The indictment is lengthy and verbose, covering ten pages of the state's brief. It would serve no useful purpose to embody it in this opinion and a brief statement of what it contains will be sufficient to dis-

898

pose of the points urged by appellant. In the forepart of the indictment the four defendants charged are described as being members of the International Hodcarriers' Building and Common Laborers' Union of America, Local No. 42, which is affiliated with the American Federation of Labor, an international organization. The four persons charged are Earl Jenkins, Paul Hulahan, Edward Hill and Orville Golden. A severance was asked for and this trial pertains to defendant Hill. The four indictees are described as officers of the local, Hill as president, Golden as financial secretary and treasurer and Hulahan and Jenkins as business representatives. The four named held those positions from January 1, 1941, to October 10, 1941. The indictment then charges that during that time members paid into the union and to the four defendants the sum of approximately $289,000.00 as dues and initiation fees; that the defendants received that sum by virtue of their official positions held in the union. The indictment further charges that the four named entered into a conspiracy to embezzle and secrete the moneys of the union and to convert the same to their own use; that in pursuance of such conspiracy the four defendants, with intent to convert to their own use the sums of $65,339.89 and $86,015.28, being a part of the $289,000.00 collected, did destroy, conceal and withhold receipts and stubbooks evidencing the separate payments made by the union members. The indictment then charges in detail as to how the four defendants, with intent to embezzle $51,888.50 of the money collected, made false entries showing that only $41,657.50 had been collected, whereas, if true entries had been made the records would have disclosed the sum actually collected to have been $93,543.00. The indictment also charges that the sum of $120,402.50 was received by the defendants on which no record entries were made; then in a separate paragraph that the defendants did embezzle the sum of $65,339.89 and in the next paragraph that the defendants did embezzle $86,015.28. The indictment concludes as follows: That the defendants, and each of them, ''did then and there unlawfully, feloniously and fraudulently embezzle, convert to their own use, and to the use of each of them, and make way with and secrete said sum of Eighty-six Thousand Fifteen Dollars and Twenty-eight Cents, ($86,015.28); and did in the manner and form aforesaid, feloniously secrete, steal, take and carry away, said sum of Sixty-five Thousand Three Hundred Thirty-nine Dollars and Eighty-nine Cents, ($65,339.89) and said sum of Eighty-six Thousand and Fifteen Dollars and Twenty-eight Cents ($86,015.28), in the total amount and sum of One Hundred Fifty-one Thousand Three Hundred Fifty-five Dollars and Seventeen Cents, ($151,355.17), contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State.''

■ The indictment was drawn under section 4478 R. S. Mo. (1939), Mo. R. S. A. We agree with appellant that the indictment is somewhat confusing. It contains much surplusage and many repetitions. It details the manner in which the defendants are alleged to have made false entries as to certain sums of money collected so as to cover up a shortage. This was probably unnecessary. However, after a careful analysis, we have concluded that it is sufficient to withstand a demurrer. At the expense of repetition we will state the ultimate facts alleged in the indictment. It describes in detail the defendants and their connection with the union. It alleges that the defendants entered into a conspiracy to embezzle the funds of the union. It specifically alleges that the defendants conspired to embezzle two sums, that is $65,339.89 and $86,015.28. The indictment then particularizes as to how defendants falsified ■ the books and sets forth the amounts covered up by false entries and failure to make entries in the books. The charging part of the indictment is confined to $151,355.17, embezzled by the defendants, which it is alleged was a part of the $289,000.00 collected between January 1, 1941, and October 10, 1941. Under that indictment the state could show any embezzlements of the funds collected during that period and a conviction thereon would be a bar to any further prosecution for embezzlement for any of those funds during that period. We hold that the trial court did not err in refusing to quash the indictment. State v. Knowles, 185 Mo. 141, 83 S. W. 1083, l. c. 1089; State v. Wise, 84 S. W. 954, 186 Mo. 42.

■ The second and third grounds relied on by appellant may be considered together. They are substantially the same. We cannot agree with appellant that the indictment charges him with a misdemeanor, that is a conspiracy, and also a felony, embezzlement. True, the indictment alleges that appellant and the other defendants conspired to embezzle funds of the union, but the indictment charges that pursuant to the common design the embezzlement was actually consummated. The allegations as to the conspiracy merely set forth the manner in which the defendants perpetrated the offense. State v. Montgomery, 116 S. W. (2d) 72, l. c. 73 (1, 2); State v. Kolafa, 291 Mo. 340, 236 S. W. 302, l. c. 305 (2). If a conspiracy be proven, as alleged, anyone who participated therein would be guilty of embezzlement and be held responsible for acts of other conspirators committed in furtherance of the common design. The allegations as to the defendants' common design or conspiracy to embezzle the funds of the union do not render the indictment defective because of duplicity. State v. Ball, 321 Mo. 1171, 14 S. W. (2d) 638, l. c. 643 (1).

■ Appellant asserts that the evidence was insufficient to sustain the verdict of guilty. Since the judgment of conviction must be reversed and the cause remanded for retrial because of an error to be considered later, we will not make an extended statement of the facts

as supported by the state's evidence. The bill of exceptions covers over nine hundred pages, but as is not unusual in cases of this nature the chaff is unproportionately large as compared with the amount of grain. The evidence in the record discloses that the local union had its offices on Finney avenue, west of Grand avenue. Due to the influx of labor attracted by war industries located in the city of St. Louis and territory controlled by the local, the union received an unusual amount of initiation fees from laborers desiring to work in the various war plants. The membership in the union was classified in the following three groups: Residential, which required an admission fee of $15.00; TNT, a fee of $25.00 and Commercial, a fee of $50.00. In addition to that each applicant was required to pay quarterly dues of $6.00, and fifty cents for a death fund. So the fees to be paid for membership were $21.50, $31.50 and $56.50, as above classified. Appellant, Hill, was president of the local. He also worked in the office and one of his duties was to receive admission fees and dues for which he gave the payers receipts. Golden was secretary and treasurer and as such had charge of the books and the cash of the union. Two bookkeepers were also employed in the office. Prospective members of the union were permitted to pay the admission fees and dues in instalments during which time they were given a permit to work. Upon completion of payments the receipts given for the payments were returned to the union whereupon a membership card and a booklet by the International Union at Washington, D. C., were issued. Thereafter the dues were credited in the booklet held by the member. The local paid a per capita tax to the International office located at Washington. An audit of the books, made after October 10, 1941, disclosed that on January 1, 1941, the local had on deposit in the Telegraphers National Bank a sum of $34,495.13. The amount collected from January 1, to October 10, was $289,473.35. The amount expended during that period was $54,089.35. The balance on hand as per the audit should have been $269,879.13. However, the auditors were able to locate only $183,866.85, hence a shortage of over $86,-000.00. The audit disclosed that from January 1, 1941, to June 1, 1941, the residential class had 1659 members listed on the books and the commercial class 106 members. The audit also disclosed that 1553 should have been classified as commercial and only 287 as residential. It must be remembered that the commercial class paid $56.50 to enter the union and the residential only $21.50. The audit showed that during that period $112,290.35 were collected but the books disclosed that only $61,143.90 were collected. When the audit was made the money on hand belonging to the union was located in various places. Some in safety deposit boxes in banks, some in checking accounts and other money was located in cigar boxes and bags. Defendant Hill had quite a sum in cigar boxes at his home. The explanation of Hill as to the cash in his possession will be noted

later. It was the duty of a board of trustees to audit the books of the company quarterly and report the result of the audit to members of the union. No such audit was made in 1941. However, the evidence disclosed that an audit was made by a Mr. Lanfersieck in July, 1941. This audit was not a complete one as it disclosed only the amount taken in and the amount expended. It did not disclose the actual financial condition of the union. It is the contention of the state that Mr. Lanfersieck was employed by Mr. Hill and that Hill and Golden instructed Mr. Lanfersieck as to what kind of an audit was to be made; that this was done deliberately so as to cover up a shortage. Defendant Hill did not make any entries in the books but did write out receipts for the dues paid him by members. A number of these were for payments of $56.50 by members in the commercial class and were entered in the books in the residential class as only paying $21.50. On August 4, 1941, Golden disappeared and did not return to the office until September 20. His explanation was that he had been on a drunk and during his absence had been to Albuquerque, New Mexico. During Golden's absence Hill acted as financial secretary. The business of the union was exceedingly heavy during that time. About $70,000.00 were collected. The books were not posted during that period but the receipt stubs were kept to disclose the amount collected and from which proper records could be made. Hill contended that the keeping of the books was under Golden's jurisdiction and he did not want to assume that obligation. The cash taken in during Golden's absence was not deposited in a bank. Hill testified that he had no authority to do any banking. He rented a safety deposit box at the Lindell Trust Company and filled it with cash and checks taken in during Golden's absence. After the box was filled he placed money in cigar boxes and took it home for safekeeping. He also placed some in a bag and sent it to the Lindell Trust Company. He explained this by stating that from day to day he hoped Golden would return and then the amount of money he had collected could be ascertained and turned over to Golden.

What occurred on October 29 and 30 would be interesting to detail but for the sake of brevity we will leave that to a writer of novels and state here only the ultimate facts. Two men, representing themselves to be connected with the federal government, informed the officers of the local to meet them at the office of the union on October 30, that they were investigating "job selling." The meeting was held and Hill, Golden, Hulahan and Jenkins were present. The result of the meeting was that Golden accompanied the pretended officials to a bank where some $40,000.00 were extracted from a safety deposit box to be taken to the federal building and counted. He then accompanied the men to the federal building where he took a receipt for the money and left. The two men and the cash disappeared. This incident resulted in an investigation by the Federal Bureau

of Investigation. The officers evidently thought Golden or someone else in the local had conspired with the fake federal men to extract the cash from the safety deposit box. Golden and the other officers were questioned at length. Golden's premises were searched and money was found hidden in a feed box. The investigating officers confronted Golden with that fact and other incriminating evidence whereupon Golden made a confession to the officers informing them that Hill, Hulahan, Jenkins and himself had entered into a conspiracy to defraud the union by embezzling its funds.

This confession of Golden made in writing, his oral statements, and remarks made by his wife to the officers were introduced in evidence against appellant. Appellant objected to this evidence on the ground that the statements of an alleged co-conspirator, made after the conspiracy had ended and out of the presence of the defendant, were not admissible in evidence against him. The trial court overruled the objection and the point was preserved for review. An accomplice in crime or a co-conspirator may testify against other participants in the crime. State v. Morefield, 342 Mo. 1059, 119 S. W. (2d) 315, 1. c. 317 (5, 6); State v. Link, 318 Mo. 1179, 3 S. W. (2d) 369, 1. c. 370 (2). So too may the state introduce evidence of statements made by one participant in crime against another if the statements were made in furtherance of a conspiracy. The fact that the alleged statements were made after the crime had been perpetrated does not necessarily render the statements inadmissible. 22 C. J. S. 1319, sec. 771, page 1309, sec. 768. In State v. Priesmeyer, 327 Mo. 335, 37 S. W. (2d) 425, 1. c. 427, this court commented as follows:

"If a conspiracy continues for any purpose such as disposing of the loot, the effecting of an escape, the concealing of the crime, the admissions of one conspirator would be admissible against another."

See also 22 C. J. S. 1320, sec. 772. The fact that a conspirator was under arrest at the time the statements were made is not always conclusive against the admissibility of the statements in evidence. However, statements of one conspirator cannot be used as evidence against another unless they were made in furtherance of the conspiracy. This is an indispensable requirement, (22 C. J. S. 1323, sec. 774) unless, as is sometimes the case, the statements be considered a part of the res gestae. 22 C. J. S. 1328, sec. 777. It must be remembered in this case that Golden's statements, which were used against Hill, were made when Hill was not present. With the foregoing in mind let us examine the circumstances under which Golden made the alleged statements and confession admitted in evidence against defendant Hill and determine the admissibility of such evidence. Extraction of $40,000.00 of the local's money by the fake officers and Golden created quite an uproar. The attorney for the local was advised of what had occurred and promptly made an investigation and discovered the union had been defrauded. This

led to an immediate investigation by the Federal Bureau of Investigation. The men assigned to this task questioned everyone connected with the office of the local including the four indictees, that is Golden, Hill, Hulahan and Jenkins. After a thorough inquiry Hill, Hulahan and Jenkins each made a separate written statement to the officers, and according to these statements they were not guilty of any wrongdoing. Golden was questioned on several occasions and also made a written statement to the officers which was not incriminating. Later, in the presence of his wife, he was confronted with incriminating evidence, such as the finding of money in his garage in a feed barrel, the suspicious circumstances under which he accompanied the fake federal men to the bank and let them have the money and how he later informed the people at the local union office that the men would not be there to meet them at the appointed hour. Golden then said to the officers: "I know it looks bad for me." Whereupon Golden's wife spoke up and said: "Orville, don't be the goat, if you are wrong admit it and take your rap, but don't take the rap for anyone else." Golden then requested his wife to leave the room. It was then that Golden made the incriminating statements, both oral and written, which were introduced in evidence against Hill and in which he implicated Hill, Jenkins and Hulahan. In substance Golden stated that the four had conspired to embezzle funds of the union and that $6,000.00 of the local had been equally divided among them. The written statement detailed how the records were falsified so as to cover up shortages. Golden stated that the money to be embezzled was placed in safety deposit box 104 from which the men representing themselves as Internal Revenue Collectors took the cash on September 30. These statements of Golden were made on October 9. We do not find any legal theory under which this evidence could be used against defendant Hill. The statements were narrations of past events and did not have any semblance of having been made in furtherance of a conspiracy. They were confessions made to officers of the law after the author of the statements had been accused of being implicated in the crime. We are of the opinion that the rule as stated in 22 C. J. S. 1305 must be applied. It is there stated as follows:

"Narrative statements of past events, made after the termination of a conspiracy, are inadmissible against co-conspirator. Such narratives are rejected as hearsay." State v. Priesmeyer, 327 Mo. 335, 37 S. W. (2d) 425, l. c. 427; State v. Buckley, 318 Mo. 17, 298 S. W. 777, l. c. 780 (1-3). The state in its brief has the following to say on this point:

"Appellant contends that these statements were inadmissible because the conspiracy had not yet been shown. This court has held in many cases that the admission of such evidence was entirely in the trial court's discretion. In the case of State v. Parr, 246 S. W. 903, l. c. 906, 296 Mo. 406, . . . "

904

The cases cited by the state, State v. Parr, 246 S. W. 903, 1. c. 906, 296 Mo. 406; State v. Fields, 234 Mo. 615, 138 S. W. 518, and other cases cited, do not sustain the statement quoted from the brief. This court in those cases held that the order of proof was within the discretion of the trial court, that is, it was not error to permit the introduction of evidence of statements alleged to have been made by a co-conspirator in furtherance of the conspiracy before the state had introduced evidence establishing the conspiracy. That is an entirely different question than the one under consideration. In the examination of witness Duffey, connected with the F. B. I., emphasis was placed on the fact that when Golden made the statements he was not under arrest. That, however, is not decisive of the question. Golden made the statements after he had been questioned at length and after he had been accused. When Golden had completed his statements the F. B. I. agents called the local police officers who responded and placed Golden under arrest. We have diligently searched the record and have been unable to find any justification for the admission of the evidence, therefore, we must hold that its admission was prejudicially erroneous. Evidence against Hill was entirely circumstantial aside from Golden's confession.

 Error was assigned to the action of the trial court in permitting introduction of book entries made by employees of local 42, because they were not made in the ordianry course of business and not binding on defendant Hill. Hill had been in the office for a number of years. He acted as the financial secretary in Golden's absence. We are of the opinion that the question of whether he had any guilty knowledge of the false entries was for the jury to decide. Hill of course would not be responsible for any act of wrong-doing of anyone else unless he was a participant in a plan to defraud the union. The same may be said of the audit made by a firm of auditors. The audit of necessity must have been made from the records kept by the union. Any discrepancy or shortage arising therefrom would not be chargeable to Hill unless he was a party to the crime. Whether or not he was is a question for a jury. Appellant, as stated above, preserved for our review the question of the sufficiency of the evidence to sustain a conviction. Aside from Golden's confession it was all circumstantial evidence. But since his conviction cannot be sustained because of the error in admitting those statements we refrain from passing upon the sufficiency of the evidence and have deemed it best to reverse the conviction and send the case back for retrial. We do think a retrial is justified. The issues no doubt will be better known and the trial may be substantially shortened.

For the error indicated the judgment is reversed and the cause remanded. *Bohling, C.,* concurs; *Barrett, C.,* absent.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.